JASPER E. JONES, Judge.
Plaintiff, Talmadge Kinnebrew, a cattle raiser, appeals a judgment rejecting his-demands for damages from defendant, Nelson Electric Co., allegedly caused by defendant poisoning plaintiff’s cattle. We affirm.
Defendant is engaged in the manufacturing of marine electrical parts in Claiborne Parish. It uses in the manufacturing process toxic chemicals containing acid and copper. Defendant uses approximately 600 gallons of water per hour in the manufacturing process. The water and non-toxic materials are disposed of through a drain in the manufacturing plant which exits the building through a drain pipe which discharges the waste water into a ditch which enters plaintiff’s pasture approximately 300 ft. north of the manufacturing plant. The toxic chemicals in the manufacturing process, including the acid and copper, were normally placed in large barrels and trucked from the manufacturing location to a distant site by a firm engaged in the business of disposing of toxic waste.
In August 1978 defendant obtained a permit from the Louisiana Stream Control *522 Commission authorizing it to discharge the waste water in the manner described provided that the lead and copper content of the waste water remained at prescribed non-toxic levels.
Plaintiff had 24 mature cows, 1 bull, and 8 calves pastured in a 147 acre pasture located immediately north of defendant’s manufacturing plant, across which the drainage ditch passed containing the waste water from defendant’s plant. This drainage ditch emptied into D’Arbonne Creek. D’Arbonne Creek was dry at the time of the cattle deaths except for the water that drained into it from defendant’s plant. In addition to the water in the ditch, the cows were also provided water in a 150 gallon tank which plaintiff filled daily.
On October 13, 1978, one of plaintiff’s cows was found dead in his pasture, and during the following 17 days, five more of plaintiff’s cows were found dead in the pasture. On October 30 plaintiff was advised by an employee of the Louisiana Stream Control Commission that the water in the drainage ditch contained toxic acid and he removed the remainder of his herd to another location several miles away.
On one occasion in October, defendant poured a few gallons of liquid containing prohibitive levels of acid and copper .into the drain leading to the ditch. This was done because all the barrels used to ship the toxic waste to the disposal site were full. On October 30 an officer of the Louisiana Stream Control Commission tested the waste water being released in the ditch at defendant’s plant and found it to contain acid and copper above the levels permitted by the Louisiana Stream Control Commission.
An independent research organization employed by defendant tested weekly the waste water being discharged by defendant’s plant, and the defendant tested the water daily. Except for the tests run October 30 these tests showed the acid level of the water as being low enough, within the guidelines set by the Louisiana Stream Control Commission, for disposal into the ditch. Some of the weekly tests showed a copper level in excess of the permissible limits.
The trial judge found: that plaintiff had 7 cows die in October; that the water coming into plaintiff’s pasture from defendant’s plant was toxic; that defendant was negligent in placing the poisonous water into plaintiff’s pasture; and that this water could have killed the cows. The trial judge after having made these factual determinations, rejected plaintiff’s demands because plaintiff failed to prove by a preponderance of evidence that the deaths of the cattle were caused by the toxic water placed by defendant into plaintiff’s pasture. The reasons of the trial court on the absence of causation are:
“The Court is not convinced by plaintiff’s evidence that the discharge from defendant’s plant caused the death of the cattle, it being just as feasible that the cows could have died of anaplasmosis. The defendant’s expert, Dr. Davis, was quite convincing in his contention that had the cows died of an acidic condition their bodies would not have bloated, the calves would have died first, and that cows aren’t likely to drink acidic water if there is another source. It was his opinion that the cows died of anaplasmosis because this disease affects about thirty per cent of a herd and does not affect the calves.
It is the conclusion of the Court that the plaintiff did not prove that the defendant’s negligence was the cause of the death of his cattle, and in fact, the defendant proved to the Court by a preponderance of evidence that a more probable cause of their death was anaplasmosis.”
Plaintiff or his employees inspected his cattle every day. The testimony of these witnesses established that the cows never evidenced any signs or symptoms of being ill. The principal thrust of plaintiff’s case was directed towards a contention that the high acid content in the water killed plaintiff’s cows. However, plaintiff also contended that a high copper content in the waste water was also responsible for the death of the cows. Defendant’s expert, Dr. Davis, a veterinarian, testified that cattle drinking water with a PH 3 acid (this was *523 the acid content of defendant’s waste water being placed into the drainage ditch on October 30 at the time it was tested by the Louisiana Stream Control Commission)[1] content over an extended period of time could become sick and die from acid poisoning. He explained that the stomach of a cow contained some acid necessary to normal digestive processes, and that when water containing a PH 3 acid content was drunk by the cow, that at the outset the PH of the ingested water would be elevated[2] by the digestive process of the stomach and the volume of other material contained in the cow’s stomach, and for this reason for a period of 48 to 72 hours the cow would appear to have no harmful effects from the acid. After the elapse of 72 hours the defensive mechanisms contained in the cow’s body would be broken down and cease to function by virtue of the effect of the acid. The cow would then stop eating, become emaciated, and dehydrated. She would have colic and abdominal pains. There would be a bloody mucous discharge from her rectum. Dr. Davis testified that after two days of these symptoms the cow would die.
Dr. Davis testified that many authorities do not consider copper toxic to cows,[3] but he believed copper could be fatal to a cow if she consumed it over a long period of time. Dr. Davis stated that copper ingested into the cow’s body was stored in the liver, and when the liver was unable to store it any more, the copper would spill over into the bloodstream and the cow would begin to exhibit signs of illness. He stated that a cow suffering from copper poisoning would stop eating, have diarrhea, dehydrate, and after these symptoms were exhibited for some two days, she would die.
All plaintiff’s cows which died were mature animals and pictures of several of them contained in the record reflected that they bloated following death. Dr. Davis pointed out that a cow suffering from acid poisoning would not bloat. The activity in her stomach which would normally cause her to bloat on death has been terminated by the poison which she has ingested. Plaintiff’s cows which died weighed 800 lbs. Dr. Davis testified that calves which weigh less than mature cows would become sick and die from the copper or acid poisoning before the heavier cows. Plaintiff had no calves to die, nor did any become ill. Dr. Davis concluded that because none of plaintiff’s cattle had any symptoms of illness before they died; because none of the calves became sick; and because the evidence established the cows bloated upon death that plaintiff’s cows did not die from the acid or copper poisoning.
Dr. Brantley, a veterinarian, plaintiff’s expert witness, never took an autopsy upon the cows, though he was called to the pasture after the second one died. Dr. Brant-ley recognized that a cow suffering from acid poisoning would have apparent symptoms of illness before death. He further acknowledged that calves ingesting acid and copper would become sick and die before the heavier cows that consumed acid or copper from the same source. Plaintiff offered no evidence which refuted the testimony of Dr. Davis as to the effect of acid and copper poisoning upon cattle, the delay required for the effect of the poison to become apparent, and the period of time that the cow would display these symptoms before her demise.
Dr. Davis believed the cattle died from anaplasmosis which is a disease transmitted by blood-sucking insects and is found in this area of the state and is more likely to kill cattle in the fall of the year than any other time. Normally this disease will kill no more of the adult cattle than % of the herd *524 before it runs its course. Plaintiff lost 7 adult cows which was approximately Vs of his adult herd. Anaplasmosis does not affect calves and the fact that plaintiff lost only adult cows was probably the strongest reason for Dr. Davis’ conclusion that the cattle probably died from anaplasmosis.
In order for plaintiff to recover from defendant he must prove by a preponderance of evidence that the negligence of defendant in permitting acid and copper to get into the drinking water supply of the cattle brought about the death of some of them. Condet v. Cohen, 9 So.2d 257 (La.App.2d Cir. 1942); Buatt v. Petty, 15 So.2d 825 (La.App.2d Cir. 1943); Desselle v. Avery, 73 So.2d 326 (La.App.2d Cir. 1954); Watson v. Mid-Continent Aerial Sprayers, Inc., 170 So.2d 149 (La.App.2d Cir. 1964).
In our recent decision of Gaar v. State, Through Dept. Hwys., 389 So.2d 426 (La.App.2d Cir. 1980), we denied plaintiff’s claim for the damage to his cattle based on arsenic poisoning because he failed to prove their sickness was caused by negligence of defendant. We there reiterated the rule as follows:
“Proof by a preponderance of the evidence simply means that, taking the evidence as a whole, such proof shows that the fact or cause sought to be proved is more probable than not.” Id. at 428.
There is substantial evidence in the record to support the trial judge’s conclusion that plaintiff failed to prove his case by a preponderance of evidence and the trial judge was not clearly wrong, nor did he commit manifest error. Moreover, we are impressed with Dr. Davis’ testimony and conclude that if plaintiff’s cattle had suffered acid or copper poisoning plaintiff and his employees during their daily inspection of the herd would have observed some of them not eating and displaying other systems described by Dr. Davis. We are in full agreement with the trial judge’s factual finding that plaintiff failed to prove causation.
The defendant answered the appeal complaining that the expert witnesses’ fees fixed by the trial judge for its experts were inadequate. The trial judge awarded expert witness fees as follows:
Dr. Edward Davis (a veterinarian) .$100.00
Dr. Robert Flournoy (a toxicologist) .... 75.00
Dr. Ray Germany (an expert in the field of fishery science). 50.00
The trial judge has much discretion in fixing the fees of expert witnesses because he sees and hears them testify and can best evaluate their value to the resolution of the litigation. We acknowledge that the fees set are on the low side, but conclude that these determinations do not reflect that the trial judge abused his discretion in awarding these expert witnesses’ fees.
Judgment AFFIRMED at appellant’s cost.

.Plaintiff removed all his cows from the pasture into which the waste water drained on October 30, 1978, and there is no evidence establishing that on any earlier date this waste water contained any excessive amount of acid which would have been harmful to cattle.

. The toxic effect of acid increases as the PH factor decreases. Tests reflecting acid content of PH 5 or above are considered as reflecting acid content of no toxic effect upon cattle.

. This was the testimony of Dr. Robert Flour-noy, a toxicologist, who was one of defendant’s expert witnesses.